UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
BRUCE KING,                             :
                        Petitioner,     :
                                        :      02 Civ. 5810 (DLC)
            -v-                         :
                                        :      OPINION & ORDER
CHARLES GREINER,                        :
                        Respondent.     :
----------------------------------------X

Appearances:

Pro se petitioner:
Bruce King
96-A-6939
Upstate Correctional Facility
PO Box 2001
Malone, NY 12953

For respondent:
Andrew M. Cuomo, Attorney General of the State of New York
Alyson J. Gill, Assistant Attorney General
Jennifer L. Johnson, Assistant Attorney General
120 Broadway, 22nd Floor
New York, NY 10271


DENISE COTE, District Judge:

    Bruce King filed this petition for a writ of habeas corpus

in 2002, challenging his conviction on robbery charges following

trial in 1996.  In a report of September 26, 2008, the Honorable

Andrew Peck recommends that the petition be denied ("Report").

For the following reasons, the petition is denied.

BACKGROUND

As explained in great detail in the Report, which is incorporated by reference, King was convicted at trial of two robberies which took place on November 22 and December 3 of 1995 at two Martin Paint stores in Manhattan.  King was not immediately arrested for those crimes, but he was arrested in connection with a robbery of a Martin Paint store in Queens on December 31, and then released.  On January 2, 1996, King contacted the police and spoke with them for hours at a Queens precinct station, identifying his accomplices in the two Manhattan robberies without admitting his own involvement in the crimes.  He was soon thereafter identified in line-ups by victims of both Manhattan robberies.

The November 22 robbery was committed by King and Carl Dade ("Dade"), both of whom wielded guns.  King put his gun against the back of a stockman's neck and forced him to lie on the floor.  The general manager Nathan Rivera and an assistant manager were held at gunpoint by Dade.  Dade collected money from the registers and with Rivera's help emptied the store's lockbox.  Rivera had a good view of King, who was standing seven feet away in a well lit room at one point during the robbery, and was able to identify him in the line-up and at trial.

When King and Dade entered the Martin Paint store on December 3, they were greeted by employee Fred Crosby, who got a

good look at King at three different points during this robbery, one of them as King stood about three feet away. An accomplice, Andrew Williams ("Williams"), waited outside in a car. King went to the rear of the store, pulled out a gun, and confronted the store manager as he was opening the store's safe. King got about $8,000 in this robbery. Crosby identified King in a line-up and at trial.

As officers from the Manhattan Robbery Squad were visiting a Queens precinct on January 2, 1996, King called the precinct to protest that he didn't want the Queens robbery pinned on him and had information about a homicide case. When King came to the precinct the Manhattan officers told him that they wanted to talk to him about the Manhattan Martin Paint store robberies. King described men named "Williams," "Pops Dade," and "Jerry" during the course of the ensuing conversation, explaining that they had committed numerous robbers of Martin Paint stores in New York City. He explained that a man named "Chapman," who worked at Martin Paint, identified the stores that took in the most money and where the money was kept in each store. Later that day, King rode with the detectives to look for Williams and Dade.

The police arrested Williams and Dade on January 3, and arranged for separate line-ups for King, Dade and Williams.

Rivera identified King that day.  Crosby identified King in a line-up on January 17 which King's attorney attended.

King's fiancée Jacklyn Charles and his brother Andrew Smith testified on his behalf at trial, in an effort to provide alibis for the November 22 robbery, but gave conflicting testimony on some points.  In addition, the prosecutor cross-examined Charles about the statement she had made to detectives that she was afraid of King.  The trial judge denied the defense motion for a mistrial based on this line of cross-examination.

In its rebuttal case, the state presented evidence that contradicted the alibi testimony and confirmed that Charles had told the police that she was terrified of King.  Medical records and other testimony was offered to show that King had no difficulty walking, despite Charles' testimony that he had to hop with crutches or use a walking stick.

During summations, King requested the opportunity to testify.  The judge allowed the defense case to be reopened, and King took the stand against his counsel's advice.  Among other things, King explained that Charles had reminded him that he had spent time with her on November 22.  He added that Williams periodically borrowed King's car and had once done so for a long time.  King explained that he had visited a Martin Paint store in Queens on December 31 to price carpeting, and noticed that people ran out to look at his car.  Later that day Williams

asked King if he had gone to a Martin Paint store and explained
that he had gotten into "a beef" with someone at the store while
he was in King's car.  Later, Williams explained that the police
were looking for a black car that was involved in robberies, and
King concluded that Williams had committed robberies while using
King's car.  King then called the police, and went to speak with
them.  He added that he had denied to them that he had loaned
his car to anyone.  After speaking with the police for several
hours, they photographed him and he left.  The next day, he was
arrested, questioned about, <u>inter</u> <u>alia</u>, the Martin Paint store
robberies after being advised of his <u>Miranda</u> rights, and
released.  On January 2, King spoke to Williams again and, based
on that conversation, knew that Williams was involved in the
robberies.  King called the police and reported his conversation
with Williams.  He went to the precinct again, answered more
questions about the robberies, and appeared in several line-ups.
In a line-up of January 17, in which the trial testimony had
indicated that a witness identified a suspect wearing the number
3, King testified that he in fact had been wearing the number 5.

  When King was questioned on cross-examination about his prior
convictions, he explained that they stemmed from his work as a
confidential informant for the DEA.

     In the second set of summations, the defense argued that
King's prior convictions were all for petty crimes, unlike the

charges at issue in the trial.  As described in more detail below, the prosecutor described King as a career criminal and asked the jury to not let King "get away with it".

The jury convicted King of two counts of first degree robbery and one count of second degree robbery.  On October 16, 1996, King was sentenced principally to two consecutive terms of twelve and one-half to twenty-five years' imprisonment.

The Report describes the post-conviction procedural history in detail.  Of particular note, while the First Department affirmed the conviction on August 3, 2000, Justice Ernst H. Rosenberger dissented and recommended a remand for a new trial on the sole ground of the prosecutor's inflammatory and misleading summation.  People v. Anonymous, 712 N.Y.S. 2d 482, 486-87 (1st Dep't 2000).  The Court of Appeals affirmed on June 5, 2001, in a written opinion.  As for the summation issue, it wrote, "We note the point raised by defendant as to the prosecutor's improper comments during the summation, but are unable to reach it.  We do not condone the summation and base our affirmance solely on defendant's failure to preserve the issue." People v. Anonymous, 96 N.Y. 2d 839, 840 (2001).

King filed his first motion under § 440.10 of the New York Criminal Procedure Law ("C.P.L.") on June 25, 2002, and it was denied on March 24, 2003.  The Appellate Division denied leave to appeal.

King filed this habeas petition in federal court on July 24, 2002, and it was referred to Judge Peck on August 15, 2002 for a report and recommendation.  Judge Peck recommended that King's petition be denied so that he could return to state court and exhaust his claims.  A January 7, 2003 Order dismissed King's petition and advised King that he could file the petition within 91 days after the state court decided his renewed CPL § 440.10 motion.

On December 28, 2007, King filed a renewed petition.  King amended his petition on May 13, 2008.  Judge Peck issued the Report on September 26, and King received it on October 1.  King requested and received three extensions of time to file his objections to the Report, the last of which set a final January 6, 2009 deadline.[1]

On January 6, 2009, King submitted a thirty-five page document combining his objections to the Report ("Objections") with a motion made under Federal Rule of Civil Procedure 60(b). The document complains about the proceedings in state court during his renewed CPL § 440.10 motion.  While King requests that the Court first rule on his Rule 60(b) motion and dismiss

---

[1] In his October 9 request, King sought a thirty-day extension. In a November 14 request, King sought twenty-five more days.  In a December 4 request, King explained that he needed more time to type and prepare his objections.  A December 15 Order advised him that there would no extension of the January 6, 2009 deadline to file objections.

the petition so that he can return to state court and attack his conviction further, the Objections also address the petition's claims in detail and discuss the Report.

In the Objections, King describes the events that occurred between January 2 and 4, 1996, and argues that there is documentary evidence regarding the line-ups and other investigatory steps taken in those days that reveals that the state manufactured the evidence that it presented to the grand jury.  He discusses the trial evidence and complains about the police testimony that King had come to the precinct in early 1996 of his own free will and that Charles was afraid of King. The Objections also recite the procedural history of this case and reiterate many of the petition's claims.

King's Rule 60(b) motion appears to claim that documents related to the events between January 2 and 2, 2006, have mysteriously vanished as a result of a conspiracy in the District Attorney's Office.  King had attached these records to his renewed CPL § 440.10 motion in 2003, but someone stole all of the court records, and as a result the state court never examined his evidence.  Moreover, the state court's denial of his renewed CPL § 440.10 motion in March 2003 "was never entered" and King did not learn of the denial for 28 months. Compounding the problem, the Appellate Division denied his appeal on the merits even though it did not have the complete

8

record supporting his motion.  In a telephone conference on September 8, 2008, Judge Peck warned King that he risked having his federal habeas petition deemed untimely if it were dismissed a second time so that he could return to state court again. Judge Peck also assured King that if he had raised an issue in state court, it would be deemed exhausted even if the state court had denied the claim.  That portion of King's January 6 submission which is characterized as a Rule 60(b) motion is denied.[2]

DISCUSSION

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  The court must make a de novo determination of the portions of the report to which petitioner objects.  28 U.S.C. § 636(b)(1); see United States v. Oberoi, 547 F.3d 436, 453 (2d Cir. 2008) (citation omitted).  To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the

_____

[2] When faced with a Rule 60(b) motion that attacks a movant's underlying conviction and not the integrity of the federal habeas proceeding, a district court may deny the motion as beyond the scope of Rule 60(b).  See Harris v. United States, 367 F.3d 74, 82 (2d Cir. 2004).  To the extent that King's Rule 60(b) motion supports King's habeas petition and conveys objections to the Report, it has been considered here.

record." Wilds v. United Parcel Service, Inc., 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003) (citation omitted).

King's Objections do not point to any error in the Report's legal analysis or identify any fact or issue that the Report overlooked.  Even with de novo review, however, King's habeas claims must be denied.[3]

Only one of the claims in King's habeas petition requires extended discussion.  King complains that the prosecutor's summation wrongfully shifted the burden of proof to King and that his attorney failed to object to the summation in a way that preserved the issue for appellate review.  After this claim is addressed, this Opinion will briefly address King's remaining claims.

---

[3] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, modified the standard under which federal courts review Section 2254 petitions where the state court has reached the merits of the federal claim.  Habeas relief may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §§ 2254(d)(1), (d)(2); Brisco v. Ercole, 565 F.3d 80, 86 (2d Cir. 2009) (citation omitted).  State court factual findings "shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see Brisco, 565 F.3d at 86.

1. Reasonable Doubt Charge and Prosecutor's Summation

King argues that the trial court's reasonable doubt charge relieved the prosecution of its burden of proof and that the prosecutor wrongfully argued during summation that the defendant had the burden to disprove the evidence.  Adopting his counsel's arguments made on the direct appeal from his conviction, King points to the following specific arguments made in the prosecutor's two summations.[4]

As for the prosecutor's remarks during the first summation, King contends that the prosecutor committed error by arguing that the jury could use its conclusion that the defendant committed the second robbery as evidence "strengthening" the testimony identifying King as a participant in the first robbery; that a missing witness for the first robbery, Anthony McNeil, had not appeared because he was afraid of the defendant; that the prosecution had "evidence" while the defendant had "perjury", thereby shifting the burden of proof to the defendant; that Crosby was a "dream" witness because he had viewed the defendant over the course of 30 minutes; and that Crosby was a reliable observer based on his testimony that he saw Williams in a late model black Cadillac outside the paint

---

[4] The defendant took the stand after counsel had completed summation arguments.  The attorneys each gave a second summation after the defendant's testimony and the rebuttal evidence was concluded.

store, and the separate evidence that Williams' common-law wife
had a 1976 Cadillac Seville.[5]

As for the prosecutor's remarks during the second
summation, which followed the defendant's testimony, King
contends that the prosecutor committed error by arguing that the
defendant had not denied committing either robbery, although the
defendant had offered an alibi for the November 22 robbery, and
by repeatedly misusing the defendant's criminal record to ask
the jury to convict him because he was a career criminal who had
escaped serious punishment for his past crimes.  Among other
things, the prosecutor stated

> I implore you now, or after your
> deliberations to say . . . it stops here
> . . . you can no longer plea bargain away
> every single thing you have done.  You can
> no longer sell information and get out from
> under.  You can no longer not answer for
> your actions.  Once, finally, and now here
> today you have to say to Bruce King, stop.
> Stop it.

As noted, there were two sets of summations, since the
defendant was given a chance to testify after the first set of
summations was concluded.  The following description of the
arguments made by defense counsel and the prosecutor in each of
their summations will help place the arguments in King's
petition in context.

---

[5] King's argument rests on the prosecutor's assertion that the
robbers had used a "black Cadillac" without evidence that
Williams' Cadillac was black.

In the first set of summations, defense counsel argued
strenuously that the identifications of King by the two
witnesses, one victim from each of the two robberies, were not
credible since the other victims at the robberies had been
unable to identify the defendant at either a lineup or during
their trial testimony.  Defense counsel briefly addressed the
alibi testimony, but urged the jury to concentrate on the
identification testimony.  He called Rivera mistaken and
asserted that Crosby was a "wise guy" and had lied.

In his first summation, the prosecutor began by arguing
that while defense counsel was skillful, the prosecutor had the
evidence and the defense case had perjury.  There was no
objection.  The prosecutor then began his own lengthy discussion
of the identification testimony, explaining why those who had
made identifications gave reliable testimony and why those
robbery victims who had not identified the defendant were unable
to do so.  When the prosecutor argued that the identification
from the second robbery bolstered the identification testimony
from the first, defense counsel's objection was sustained.
Defense counsel objected to, and the judge instructed the jury
to disregard, the prosecutor's explanation for why one of the
robbery victims had not testified at trial.  The prosecutor had
argued that the missing witness, Anthony McNeil, had refused to
be found, and that robbery witnesses don't line up to testify at

13

trial:  "can I face the man who had a gun, can I do that and put my life in jeopardy?"

Later in his summation, the prosecutor addressed the alibi testimony offered during the defense case and described Charles as a decent woman who took the stand and made things up.  He listed the various points on which her testimony had been contradicted by other evidence, including trial exhibits.  It was at this point that the defendant interjected twice that he wanted to testify.  As the prosecutor explained why he had called the school attendance coordinator as a witness to undermine further the alibi testimony, the judge sustained an objection to the prosecutor's "feelings as to why he did what."  As part of an ode to justice at the end of his summation the prosecutor requested that the jury render a verdict based on the evidence and find the defendant guilty.

After the jury was excused, the judge indicated that he would let the defendant testify.  The defense counsel explained at length why the defendant should not testify.  He argued that as the case then stood, the defendant had "a shot at winning" because of the doubt created regarding the two eyewitness identifications.  If the defendant takes the stand "I'm saying that he . . . certainly, clearly, unequivocally, without any question, will be convicted . . . .  No question about it."  Defense counsel asserted that King was no match for the

14

prosecutor and would be "devastated on the stand." He pointed to how one of King's alibi witnesses had already been "torn apart and rendered a clear liar." Despite this plea by his attorney that he not testify, the defendant insisted on taking the stand.

In the second set of summations, which followed King's testimony and rebuttal evidence, defense counsel argued that King's criminal record was for petty crimes, and not crimes against persons or crimes that involved weapons. He continued, "[t]here is a quantum leap one must take from the pattern of crimes that Bruce King committed to the type of crimes he is accused of here." Defense counsel explained that the attorneys had agreed that they wouldn't repeat their earlier summations, and would largely restrict their arguments to King's testimony and the rebuttal evidence. Defense counsel then pointed out ways in which King did not fit the descriptions the victims had initially given of the robber. He expressed his fear that King's personality and demeanor on the stand might have had a negative impact on the jury, and that they may have been exasperated by the length of his testimony and his difficulty in getting to the point. Defense counsel explained that King had a right to be angry during his testimony since he was innocent and had waited for nine months for his chance to tell that to the

jury.  He concluded by asking the jury to examine the two witness identifications carefully.

In his second summation, the prosecutor argued that the last honest thing that King told the jury was his name.  He urged the jury to not let King talk his way out of the charges. He described King as a career criminal who regularly broke the law, and thought he was immune, that the law didn't apply to him and that he could just plea bargain away whatever he did. Contrasting King's efforts to get the jury to smile with him, the prosecutor asked whether the jury thought King was laughing when he was pointing a gun at a victim's head.  The judge sustained an objection to the prosecutor's statement that someone had finally said that King would not get a plea bargain in this case.

The prosecutor asked the jury to consider that during his five hours of testimony King never denied committing the December 3 robbery and never explained where he was on November 22.  He repeated King's assertion that he had been acting as either a DEA or Customs agency informant in connection with every prior arrest.  He then argued that the DEA finally told King in early 1992 that it wanted nothing more to do with him. When defense counsel objected, the court instructed the jury that its recollection of the testimony would control. Describing King's denials that he had been convicted of several

of the crimes about which he had been questioned, the prosecutor argued that the jury should not believe King; that King was not credible.  Referring to defense counsel's argument that King was innocent of the charges he was facing, the prosecutor asked if an innocent person would have presented a false alibi at trial. The prosecutor then recounted King's conflicting descriptions of his visits to the precinct and the rebuttal testimony contradicting his account.

Responding to defense counsel's argument that King only commits "petty crimes," the prosecutor argued that King had started out small, suffered no consequences for his crimes, and thought he could talk his way and "snitch his way" out of anything.  The court overruled an objection at the end of the following statement, "Bruce King is one of the tragedies ever [sic] our society.  What you are witnessing is what happens when we in this system let someone in this system plea bargain forever.  We think we are doing the right thing--"

Asking the jury not to be misled by King's laughing, joking and smirking and not to be distracted by defense counsel's jokes, the prosecutor ended by asking the jury to focus on the identification testimony, and reminded them that the issues before them were "deadly serious."  He asked the jury to say to the defendant, "this time you don't get away with it . . . . This time the system works, for once, here."

On direct appeal, King had argued that the reasonable doubt instruction was so truncated and meaningless that it relieved the prosecution of its burden of proof.  The Appellate Division found that the challenge to the charge was unpreserved, but that if it were to review the claim it would find that the "charge as a whole" conveyed the proper standards.  As for the summation, the majority found that the challenges were again unpreserved either by a failure to make specific objections or by failing to request further relief after the defense objections were sustained.  It noted, however, that the challenged comments "were largely responsive to issues raised by the defense and did not deprive defendant of a fair trial."  The Court of Appeals also found that the challenge to the charge was unpreserved.  As for the summation, the Court of Appeals stated that it did not condone the summation, and based its affirmance "solely on defendant's failure to preserve the issue."

The Report recommends a denial of these claims on the ground that they are procedurally barred by adequate and independent state law grounds.  The Report notes as well that King did not allege cause, prejudice, or a fundamental miscarriage of justice in order to escape application of this procedural bar.

The Report also analyzes the merits of the claims, and finds no reason to recommend that the petition be granted.

After quoting various passages in the charge, the Report concludes that the charge fairly conveyed that the burden rested on the State.  Examining whether the prosecution's summation was so fundamentally unfair as to deny King a fair trial, the Report exhaustively reviewed each of the challenged comments and found that they were a permissible response to defense counsel's argument during summation, that the trial judge's actions cured any defect, or that they were not so improper as to rise to a level justifying habeas relief.

As the Report explains, King's attacks on the summation are procedurally barred since defense counsel failed either to object to, or to seek a curative instruction or a mistrial for the summation arguments on which King focuses in his petition. "Federal courts considering habeas corpus petitions are generally barred from reviewing the decisions of state courts insofar as those decisions are predicated on adequate and independent state procedural grounds." Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006).  Federal habeas review is permitted, however, if the petitioner can demonstrate either "cause for the default and actual prejudice as a result of the alleged violation" id. (citation omitted) or "that failure to consider the claim will result in miscarriage of justice, i.e., the petitioner is actually innocent." Sweet v. Bennett, 353 F.3d 135, 141 (2d Cir. 2003).  "The preclusion of federal review

applies only when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." <u>Messiah</u>, 435 F.3d at 195 (citation omitted).

Under New York law, to preserve a contention that the prosecutor's summation resulted in deprivation of a fair trial, the defendant must object to the improper remarks, and, if the objection is sustained, request a curative instruction and move for a mistrial. <u>See</u> <u>People v. Rosa</u>, 871 N.Y.S. 2d 345, 346 (2d Dep't 2009); N.Y. Crim. Proc. Law § 470.05(2). Counsel must specify the basis for an objection; a general objection is inadequate. <u>People v. Tonge</u>, 93 N.Y. 2d 838, 839 (1999). New York's contemporaneous objection rule is an independent and adequate state ground that precludes habeas relief. <u>See</u> <u>Garcia v. Lewis</u>, 188 F.3d 71, 78-79 (2d Cir. 1999); <u>Cuevas v. Henderson</u>, 801 F.2d 586, 589 (2d Cir. 1986) (contemporaneous objection requirement applied to objection to prosecutor's summation).

King also raises the issue of the prosecutor's summation in the context of his claim that trial counsel was ineffective. To succeed on an ineffective assistance of counsel claim, King will not only have to prove that his trial counsel's performance fell below an objective standard of reasonableness, but also that he was prejudiced by that deficient performance. <u>Strickland v.</u>

20

Washington, 466 U.S. 668, 687-88, 693-94 (1984); accord United
States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009).  Here, that
showing of prejudice necessarily requires a showing that
prosecutorial misconduct occurred, as there would be no
prejudice incurred by a failure to object to a prosecutor's
statement that was not improper.

The Appellate Division ruled in the alternative on the
merits of King's summation argument, finding that the summation
did not constitute prosecutorial misconduct and was thus not
prejudicial, as the summation was "largely responsive to issues
raised by the defense and did not deprive defendant of a fair
trial." Anonymous, 712 N.Y.S. 2d at 484.  As quoted above, the
Court of Appeals explicitly declined to reach the issue, finding
the objection to the summation unpreserved.  Anonymous, 96 N.Y.
2d at 840.

AEDPA requires a federal court to defer to a state court
decision that addresses the merits of a petitioner's claim.  In
such circumstances, the federal court may overrule the state
court only where its decision was "contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States" or "was
based on an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding."  28
U.S.C. §§ 2254(d)(1), (d)(2); Brisco, 565 F.3d at 86.  If the

21

federal claim has not been adjudicated on the merits, then a <u>de novo</u> standard of review applies.  <u>Dolphy v. Mantello</u>, 552 F.3d 236, 238 (2d Cir. 2009).

While the Second Circuit has deferred under AEDPA to the findings of the Appellate Division when it has issued decisions on the merits, it has done so chiefly when the New York Court of Appeals denied petitioner leave to appeal.  <u>See</u>, <u>e.g.</u>, <u>Brinson v. Walker</u>, 547 F.3d 387, 389 n.3 (2d Cir. 2008).  Whether a lower court's adjudication on the merits receives deference when a higher court explicitly declined to address the merits and ruled on procedural grounds is a distinct question that has not been decided by the Second Circuit.  In <u>Cotto v. Herbert</u>, 331 F.3d 217 (2d Cir. 2003), the Second Circuit addressed a situation where the trial court and the Appellate Division addressed an issue on its merits, but where the Court of Appeals declined to do so, finding that the issue was procedurally barred.  <u>Id.</u> at 231.  While opining that it was "inclined to conclude" that the Court of Appeals' application of a procedural bar meant that "the claim was not adjudicated on the merits in state courts," <u>id.</u> (citation omitted), it proceeded to "assume without deciding that there was an adjudication on the merits in the state courts," before finding that the state court's merits adjudication failed even deferential review under AEDPA.  <u>Id.</u> at 231, 252 (citation omitted).  <u>See also</u> <u>DeBerry v. Portuondo</u>, 403

F.3d 57, 68 (2d Cir. 2005) ("[i]t is not clear whether an adjudication on the merits by a trial court, which is neither explicitly affirmed on the merits nor explicitly rejected by the appellate court, is sufficient to trigger AEDPA review"); Monroe v. Kuhlman, 433 F.3d 236, 245 (2d Cir. 2006) (leaving undecided "whether, because the intermediate appellate court reached the merits of Monroe's judicial supervision claim, federal courts review the intermediate appellate court's decision using AEDPA deference, or whether, in light of the state supreme court's erroneous holding as to a procedural bar, we consider Monroe's claim de novo").

Even without applying deference, the prosecutor's summation, while troubling, does not rise to the level of a constitutional violation.  "As the Supreme Court has cautioned, 'a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.'" United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004) (citing United States v. Young, 470 U.S. 1, 11 (1985)).

In order to reach the level of a constitutional violation, a prosecutor's remarks must, "taken in the context of the entire trial, result[] in substantial prejudice, or so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Flaharty, 295 F.3d 182, 202 (2d Cir. 2002) (citation omitted).  On habeas review, a

court should assess three factors: "how prejudicial the prosecutor's conduct was, what measures, if any, the trial court used to cure the prejudice, and whether conviction was certain absent the prejudicial conduct." Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991). When assessing the third factor, a court considers the strength of the evidence against the petitioner. See id.

King is unable to show that he received ineffective assistance of counsel from his trial counsel's failure to make and/or preserve objections to those portions of the summation King challenges in his petition. For the reasons described in the Report, none of arguments or statements in the prosecutor's first summation on which King focuses suggests that King was denied a fair trial. The most troublesome of the prosecutor's comments in his first summation was the reference to McNeil and the speculation that he was afraid to testify against the defendant. The trial judge promptly issued a curative instruction, however, and told the jury to disregard the comment. This was sufficient to remove any taint. See United States v. Bermudez, 529 F.3d 158, 165 (2d Cir. 2008).

As for the second summation, King challenges the prosecutor's description of him as a career criminal who deserved to be punished for his life of crime, and argues that the prosecutor shifted the burden of proof to King when he

pointed out that King failed when he testified to deny that he committed the two robberies.  As for the second of these issues, King has not shown that the prosecutor's comment was inappropriate.  King having taken the stand, it was entirely proper to point out that he had not denied the charges.

The second issue that King raises, however, stands on a different footing.  The prosecutor's suggestion that the jury should convict King to break a pattern of King escaping justice by being allowed to plead to reduced charges was improper. While King's testimony, his record of convictions that were admitted during his testimony, and defense counsel's argument that those convictions for relatively minor, non-violent offenses made it less likely that King had committed the two armed robberies for which he was standing trial, opened the door to the prosecutor's discussion of that criminal record, the prosecutor could not properly ask the jury to convict King based on anything but its evaluation of the strength of the evidence against King.  It was therefore error to suggest that the jury should convict King because of his criminal record and because he had escaped appropriate punishment for past crimes.  King has failed to show, however, that these comments had any material impact on the verdict when assessed in the context of the strength of the evidence against King.

King is unable to demonstrate that the prosecutor's remarks in the second summation deprived him of due process given the evidence of his guilt.  Two eyewitnesses identified King as the robber during line-ups and at trial.  King himself identified his accomplices to the police during his interviews at the precinct.  At trial, the alibi testimony that King offered for the robberies was shown to be fabricated.  Finally, King's testimony at trial essentially corroborated the other evidence against King.  Among other things, it confirmed his association with his accomplices and further undermined his purported alibi testimony.  Having failed to demonstrate prejudice, King's ineffective assistance claim based on his trial counsel's failure to object to the prosecutor's summation remarks is denied.  Nonetheless, a certificate of appealability shall issue for this claim insofar as it is addressed to the second summation.

2. Trial Testimony Given By and About Charles

King asserts that the trial court erroneously allowed manufactured evidence during the cross-examination of Charles, his fiancée, and through the rebuttal evidence that addressed Charles' testimony.  On direct appeal, King complained that the prosecutor had cross examined Charles to the effect that King's threats had led her to give false alibi testimony and that a

police officer had testified about Charles' admission that she was terrified of King.  The Appellate Division and the Court of Appeals rejected these claims on the merits, finding that the examination and testimony were relevant and not collateral.

The Report finds that the trial court evidentiary rulings on the scope of cross examination and the admission of rebuttal testimony were not erroneous as a matter of state law, and did not deprive King of a fundamentally fair trial.  Its analysis is correct and is adopted.

3. Fourth Amendment Claims and Line-Up Procedures

King challenges his arrest and the line-up procedures which resulted in the witness identifications of him at trial.  These claims were not raised on direct appeal, but were raised in King's first CPL § 440.10 motion.  The state court did not address the Fourth Amendment claims in its ruling, but denied the identification claim because it had not been raised on direct appeal.  See N.Y. Crim. Proc. L. § 440.10(2)(c).

As the Report recommends, the Fourth Amendment claims must be denied because they are not cognizable on habeas review. Stone v. Powell, 428 U.S. 465, 481-82 (1976).  As for the claim regarding the identification procedures, it is procedurally barred by an adequate and independent state procedural ground.

4. Prosecutorial Misconduct Before the Grand Jury

King asserts that the prosecutor engaged in misconduct before the grand jury.  King raised this claim for the first time in his first CPL § 440.10 motion.  It was denied as an ineffective assistance of counsel claim.  The Report recommends denial since a claim as to grand jury matters is moot once a defendant is convicted at trial.  The Report is correct, and its analysis is adopted.  See Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989).

5.  Failure of the State Court to Conduct a Hearing regarding Prosecutorial Misconduct and Defense Counsel's Ineffectiveness and Conflict of Interest

King asserts that the court reviewing his CPL § 440.10 motion erred in not conducting a hearing to explore his assertions that the prosecutor engaged in misconduct and that his trial counsel was ineffective and labored under a conflict. The Report explains that King could have raised this claim on his appeal from the denial of the motion but did not.  As a result, there is a procedural default.  Since King has not alleged cause and prejudice nor made a showing of actual innocence, the Report recommends that the claim be denied.  Its analysis is adopted.

6.  Remaining Claims of Ineffective Assistance of Counsel

King has brought a host of ineffective assistance of counsel claims in addition to the ones addressed above in connection with the prosecutor's summation.  For the reasons described more fully in the Report, they should each be denied.

King asserts that his counsel were ineffective during the pre-trial period in that they failed to communicate with King or investigate the charges and follow his requests; prepared a boilerplate omnibus motion and failed to investigate issues concerning the line-up; failed to inform the court that King desired to testify before the grand jury or to inquire about the prosecutor's "method of direct presentment"; and waived King's right to appear at arraignment.  Insofar as King complains about his first attorney, the Report notes that that attorney was replaced about five months before trial, and his second attorney investigated the case "fully," the trial court granted a Wade hearing, and the prosecutor engaged in open file discovery.  As a result, King cannot show that he was prejudiced by any failings by his first counsel.  As for any claims concerning King's desire to testify before the grand jury, the Report notes that there is no federally cognizable claim concerning counsel's advice regarding the state grand jury process.  Similarly, the Report notes that King can not show any prejudice from his

absence at his arraignment, where a not guilty plea was entered on his behalf.

King makes a series of ineffective assistance claims concerning trial counsel, as well.  He asserts that counsel failed to file motions, filed a premature alibi notice, failed to investigate adequately King's alibi, his medical condition, and the two robbery scenes, failed to support King's pro se motions, failed to challenge the prosecution's "manufactured" evidence, and had what King characterizes as a conflict of interest.  The Report recommends that each of these claims be rejected either as meritless, as belied by the record, or as unsupported by any showing of prejudice.  Among other things, the Report examined counsel's performance at the Huntley/Wade hearing and determined that it was skillful.  As for the failure to investigate King's alibi adequately, the Report explains that King's complaint is essentially that his attorney did not anticipate that the prosecutor would be able to show at trial through Charles' co-workers and the records and witnesses from her daughter's school, that Charles' description of King's activities on November 22 was false.  In the words of the Report, counsel cannot be found ineffective "for believing King and King's alibi witnesses."  As far as counsel's failure to visit the stores that were robbed before they went out of business, the Report explains that King has not shown how he was

prejudiced since the defense did not relate to the layout of the stores and counsel examined the witnesses as to the reliability of their identifications.

One of King's claims is that trial counsel should have presented a defense that the prosecutor and police engaged in a conspiracy and manufactured a false record, apparently of witness identifications and King's admissions to the police. The court examining King's CPL § 440.10 motion rejected this contention, reasoning that counsel made a strategic decision to pursue the alibi defense and that the court could not say that the result would have been different if a conspiracy defense had been pursued in its stead.  The Report notes that King has not identified any specific evidence or testimony to support his conspiracy theory, and that the court's ruling was not an unreasonable application of Supreme Court precedent.

King's assertion that trial counsel labored under a conflict is actually a complaint that the attorney refused to file certain motions for King, didn't keep King well enough informed, didn't question particular witnesses, and didn't investigate and pursue the conspiracy theory.  The Report recommends that this claim be denied because these performance issues don't create a conflict of interest and are otherwise meritless.

31

CONCLUSION

King's January 6, 2009 Rule 60(b) motion is denied.  The

May 13, 2008 amended petition for a writ of habeas corpus is

denied.  King has not made a substantial showing of a denial of

a federal right, and appellate review is therefore not

warranted, Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005),

with the following exception.  A certificate of appealability

will issue on King's claim that trial counsel was ineffective in

failing to object to the prosecutor's second summation.

Pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this Order

would be taken in good faith as to this single issue.  Coppedge

v. United States, 369 U.S. 438, 445 (1962).  The Clerk of Court

shall dismiss this petition and close the case.

SO ORDERED:

Dated:     New York, New York
           July 8, 2009

DENISE COTE
United States District Judge